**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-26-00084-001-PHX-SHD |
| Plaintiff, | **ORDER** |
| v. | |
| Isaac Luis-Azamar, | |
| Defendant. | |

Pending before me are Defendant Isaac Luis-Azamar's Motion to Dismiss (Doc. 65)[1] and Supplemental Motion to Dismiss and Motion for Adverse Jury Instruction (the "Supplement") (Doc. 78). For the following reasons, I will **deny** the requests for dismissal and for an adverse jury instruction.

I.      BACKGROUND

Luis-Azamar is charged by indictment with one count of assaulting, resisting, or impeding a federal officer in violation of 18 U.S.C. § 111(a). (Doc. 6.) The charge arises from an incident that took place on January 30, 2026. (*See generally* Doc. 1.) Immigration and Customs Enforcement ("ICE") Enforcement Removal Operations Officers were conducting record checks of vehicles near a Home Depot in Phoenix, Arizona, when they identified a vehicle registered to Luis-Azamar's father, Silas Luis-Castro, who had previously been removed from the United States in 2012. (*Id.* at ¶¶ 3–4.) When officers

---

[1]      The other requests in Doc. 65 were resolved by prior order or withdrawn. (*See* Docs. 66, 67, 74, 76, 78, 84.)

attempted to stop the vehicle, which Luis-Azamar was driving, Luis-Azamar initially yielded, continued driving a short distance, and then came to a complete stop. (*Id.* at ¶¶ 5–6.) Mr. Luis-Castro then exited the vehicle and fled on foot. (*Id.* at ¶ 6.) After an officer apprehended Mr. Luis-Castro, there was physical contact between Luis-Azamar and one of the officers, the precise nature of which is disputed. (*Compare id.* at ¶ 6 (officer's account), *with id.* at ¶¶ 13–14 (Luis-Azamar's account).) After the physical contact, Luis-Azamar was eventually arrested. (*Id.* at ¶ 7.) Luis-Azamar intends to assert a defense-of-others theory at trial, contending that the officers used excessive force in apprehending his father and that he intervened to protect his father. (Doc. 65 at 1–2; Doc. 78 at 5.)

Both Luis-Azamar and Mr. Luis-Castro were interviewed by the Federal Bureau of Investigation ("FBI") following their arrests. (Doc. 89-1 (Mr. Luis-Castro interview transcript); Doc. 89-2 (Luis-Azamar interview transcript).) As to the encounter itself, Mr. Luis-Castro stated that he was tackled to the ground by an ICE officer and that he injured his right shoulder. (*Id.* at 10.) He further stated that he did not see the interaction between Luis-Azamar and the ICE officers. (*Id.* at 18–20.) The Government did not charge Mr. Luis-Castro with any crimes, and instead removed him from the United States on or about February 2, 2026. (Doc. 89 at 3.)

On March 2, 2026, at a status conference set to schedule a trial date, defense counsel placed on the record her intent to call Mr. Luis-Castro as a witness at trial and stated that the defense would "work with the Government" to make his testimony possible. (Doc. 86 at 7.) The Government's counsel indicated that he did not know how to facilitate Mr. Luis-Castro's testimony, but represented that he would seek guidance from his supervisors. (*Id.* at 7–8.)

Over the next two and a half months, the parties exchanged communications about how to secure Mr. Luis-Castro's testimony. (*See* Docs. 80-1, 80-2.)[2] The Government's

---

[2] This order will be available on the public docket because it discusses the sealed exhibits, the referenced interviews, and the parties' communications only in general terms and does not disclose their specific contents. *See United States v. Sarinana*, 2025 WL 1940009, at *1 (D. Ariz. 2025) (publicly filing order addressing under seal and ex parte

position evolved over that period. The Government initially indicated that it was working to parole Mr. Luis-Castro into the United States for trial, but advised that any such parole would likely require him to remain in custody during his time in this country. (Doc. 80-1 at 13–18.) The Government then took the position that it would not parole Mr. Luis-Castro in, and suggested instead that he could apply for Significant Public Benefit Parole—i.e., humanitarian parole—on his own. (*Id.* at 11–12.) The parties also discussed the possibility of a deposition in lieu of trial testimony. (*See generally id.*)

On May 19, 2026, Luis-Azamar filed a motion to depose Mr. Luis-Castro in Nogales, Sonora, Mexico, pursuant to Federal Rule of Criminal Procedure 15. (Doc. 31.) The defense represented that Mr. Luis-Castro was applying for humanitarian parole but that there was no guarantee he would be granted parole in time for the June 9, 2026 trial (which has since been continued). (*Id.* at 2–3.) On May 20, 2026, the Government responded that U.S. Customs and Border Protection ("CBP") had since advised that it would be willing and able to parole Mr. Luis-Castro into the United States either for a deposition at the federal courthouse in Tucson, Arizona, or for trial on June 9 or 10, 2026. (Doc. 33 at 2.) The Government opposed a deposition in Nogales, Sonora, and opposed parole for trial itself, expressing concern that logistical complications associated with same-day transportation from the Port of Entry could jeopardize Mr. Luis-Castro's timely appearance on the day of trial. (*Id.* at 2–3.) On May 22, 2026, I ordered that Mr. Luis-Castro be brought to the United States for testimony at trial on June 10, 2026, and directed the Government to take all reasonable and logical steps to ensure his attendance. (Doc. 51.)

On June 2, 2026, the Government raised a concern to defense counsel that Mr. Luis-

filing); *cf. Bullion Monarch Mining, Inc. v. Barrick Goldstrike Mines, Inc.*, 2016 WL 8735620, at *1 n.1 (D. Nev. 2016) ("The parties filed sealed versions of their motions with leave of court. The Court will cite to the sealed version but will reference information in sealed documents in general terms to avoid sealing this Order."); *Abrams v. CIBA Specialty Chemicals Corp.*, 2010 WL 2712241, at *1 n.1 (S.D. Ala. 2010) ("Although this Order examines and resolves a sealed motion, nothing herein reveals confidential . . . details; therefore, this Order itself is not to be filed under seal, but is instead to be maintained in the public file.").

Castro's anticipated testimony could expose him to criminal liability and that he should be appointed independent counsel. (Doc. 89-4; *see also* Doc. 65 at 3; Doc. 70 at 2–3.) On June 4, 2026, Luis-Azamar filed his Motion to Dismiss, which collectively sought five different types of relief: an emergency status conference, appointment of independent counsel for Mr. Luis-Castro, compelled immunity for Mr. Luis-Castro, an emergency deposition, and dismissal of the indictment. (Doc. 65.) Luis-Azamar argued that by raising the "issue of potential prosecution if Mr. Luis-Castro testifies," the Government effectively silenced Mr. Luis-Castro on the eve of trial, leaving Luis-Azamar unable to present a complete defense. (*Id.* at 3–5.) Luis-Azamar further argued that the Government's prior decision not to charge Mr. Luis-Castro, coupled with its refusal to grant immunity, amounted to vindictive prosecution or witness intimidation. (*Id.*)

I appointed counsel for Mr. Luis-Castro. (Docs. 67, 76.)[3] I also granted Luis-Azamar's request for an emergency status conference and ordered the Government to file a written notice stating whether it would arrest, detain, or prosecute Mr. Luis-Castro for a violation of 8 U.S.C. § 1326 if he returned to the United States to testify at trial. (Doc. 66.) The Government filed the required notice that evening, representing that it would not arrest, detain, or prosecute Mr. Luis-Castro for a violation of 8 U.S.C. § 1326 while he was present in the United States pursuant to his parole for the purpose of testifying at trial on June 10, 2026, provided he remained in compliance with the terms and conditions of his parole. (Doc. 68.)

The Government filed a written response to the Motion to Dismiss on June 5, 2026, opposing compelled immunity, an emergency deposition, and dismissal. (Doc. 70.) Later that day, at the emergency status conference, the Government extended its non-prosecution representation to include 8 U.S.C. § 1325, and I heard argument on the Motion to Dismiss. Following the emergency status conference, I denied Luis-Azamar's request to compel the

---

[3] Initial counsel was required to withdraw, and on Friday, June 5, 2026, I appointed Joseph Duarte as substitute counsel for Mr. Luis-Castro. (Doc. 76.) On June 30, 2026, Mr. Duarte moved to withdraw in light of Mr. Luis-Castro's repeated representations that he will not testify. (Doc. 102.) I granted the motion. (Doc. 103.)

Government to grant use immunity.  (Doc. 74.)

On June 5, 2026, Mr. Luis-Castro indicated through counsel that he was no longer willing to testify at trial or to sit for a deposition, even with assurances against prosecution.  (*See* Doc. 77.)  Luis-Azamar then filed his Supplement, withdrawing the request for an emergency deposition and instead seeking dismissal or, in the alternative, an adverse jury instruction.  (Doc. 78 at 8.)[4]

I set a status hearing for June 8, 2026.  (Doc. 75.)  At that hearing, Mr. Luis-Castro's counsel represented that he was not willing to testify in any capacity—neither at trial nor at a deposition, including a deposition in Mexico.  On my own motion, I continued the trial until July 14, 2026, under 18 U.S.C. § 3161(h)(7), based on the need for full briefing on the Supplement, a potential issue under *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), and the Government's late disclosure of approximately fifty pages of documents and a ten-minute audio recording.  (Doc. 84.)

On June 25, 2026, I heard argument on the Motion to Dismiss and the Supplement.[5] (Doc. 99.)  Through counsel, Mr. Luis-Castro reiterated at that hearing that he will not return to the United States to testify in this matter under any circumstances, including even if he were granted full immunity.

## II.    LEGAL STANDARD

Luis-Azamar seeks dismissal of the indictment on two distinct constitutional theories: (1) deportation of a material witness; and (2) substantial interference with a defense witness.  He also requests, in the alternative, an adverse-inference jury instruction. All three arguments arise from the Due Process Clause of the Fifth Amendment and the Compulsory Process Clause of the Sixth Amendment, which together guarantee a criminal defendant "a meaningful opportunity to present a complete defense."  *See Crane v.*

---

[4]    The Government responded on June 15, 2026 (Doc. 89), and Luis-Azamar filed his reply on June 22, 2026 (Doc. 98).

[5]    At the same hearing, I also heard argument on Luis-Azamar's Motion for Release from Custody (Doc. 87), which the Government opposed (Doc. 96), and which I denied by separate order (Doc. 100).

*Kentucky*, 476 U.S. 683, 690 (1986) (quotation marks omitted); *United States v. Juan*, 704 F.3d 1137, 1141–42 (9th Cir. 2013).

The first theory is that the Government's deportation of Mr. Luis-Castro deprived Luis-Azamar of a material defense witness in violation of due process such that dismissal of the indictment is warranted. (Doc. 78 at 5; Doc. 98 at 2.) This theory rests on the Government's "unique[]" power to "deport witnesses and thus put them outside the reach of defense counsel and the district court." *United States v. Leal-Del Carmen*, 697 F.3d 964, 971 (9th Cir. 2012). The Government may not use that power to deprive the defense of access to material testimony. *Id.* To establish that the Government's deportation of a witness amounts to a constitutional violation, a defendant must show (1) that the Government acted in bad faith, and (2) that the deportation prejudiced his case by making "a plausible showing that the testimony of the deported witness[] would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Id.* at 969–70 (quotation marks omitted). In the alternative to dismissal, Luis-Azamar requests an adverse-inference instruction. Such an instruction is appropriate where the missing witness is "peculiarly within the power" of one party and it is reasonable to infer that the witness's testimony would have been unfavorable to that party. *Id.* at 974–75.

The second theory upon which Luis-Azamar seeks dismissal is that the Government substantially interfered with Mr. Luis-Castro's decision to testify on Luis-Azamar's behalf. The Ninth Circuit recognizes that "the government may not substantially interfere with the testimony of defense witnesses." *Juan*, 704 F.3d at 1141. Unlike the deportation theory, bad faith is not required. *See Soo Park v. Thompson*, 851 F.3d 910, 919 (9th Cir. 2017). To prevail, the defendant must establish (1) that the alleged conduct amounts to "substantial government interference with a defense witness"; (2) that the Government's conduct caused the witness not to testify; and (3) that the witness's "testimony would have been favorable and material." *Id.* "A defendant alleging such interference is required to demonstrate misconduct by a preponderance of the evidence." *United States v. Vavages*,

151 F.3d 1185, 1188 (9th Cir. 1998).  The inquiry is "'extremely fact specific' and requires an evaluation of the totality of the circumstances." *Soo Park*, 851 F.3d at 920 (quoting *Juan*, 704 F.3d at 1142).

## III.    DISCUSSION

### A.    Deportation of a Material Witness

Luis-Azamar advances two arguments arising from Mr. Luis-Castro's deportation and his absence at trial.  First, he contends that the Government's deportation of his father, a material witness, violated his due process and compulsory-process rights under *Valenzuela-Bernal* and *Leal-Del Carmen*, and that dismissal of the indictment is warranted.  Second, and in the alternative, he requests an adverse-inference jury instruction permitting the jury to infer that Mr. Luis-Castro's testimony would have been favorable to the defense.  I address both theories together—and reject them—because they turn on a common threshold finding: the constitutional concern underpinning the cases Luis-Azamar cites is not implicated by the record.  And because the doctrinal framework does not support even the lesser remedy of an adverse-inference instruction, it necessarily cannot support the far greater remedy of dismissal.

### 1.    Constitutional Concern Underlying These Doctrines

The cases on which Luis-Azamar relies address a specific constitutional problem.  The Government has the "unique[]" power to "deport witnesses and thus put them outside the reach of defense counsel and the district court." *Leal-Del Carmen*, 697 F.3d at 970–71.  Because that power belongs to the Government alone, it may not use its deportation authority to deprive the defense of access to material testimony. *Id.*  The adverse-inference doctrine addresses the same underlying concern about Government control over witness availability, but offers a lesser remedy than dismissal.  An adverse-inference instruction is appropriate where: (1) a witness is missing, including because of deportation; (2) the witness is "peculiarly within the power" of the Government; and (3) it is reasonable to infer that the witness's testimony would have been unfavorable to the Government. *Id.* at 974–75.

- 7 -

These doctrines are triggered by a specific factual predicate: the Government has deported a witness, and the deportation leaves the witness unreachable by the defense. That predicate was present in both cases Luis-Azamar cites. In *Leal-Del Carmen*, the witness was deported, the defendant's lawyer had no opportunity to interview the witness, and the witness was not available to testify at trial. *See id.* at 968–69. In *Valenzuela-Bernal*, the defendant had no access to the witnesses who were deported to Mexico. *See* 458 U.S. 858, 860–67 (1982). It is that unreachability—the Government having exercised its power to place a material witness beyond the defense's practical grasp—that these doctrines address.

### 2.     The Circumstances Presented Here

This case does not fit within the unreachability framework. The record establishes two facts that, when together, take Mr. Luis-Castro's situation outside the scope of the doctrines Luis-Azamar invokes. First, the Government coordinated a parole arrangement that made Mr. Luis-Castro practically available to testify at trial. After defense counsel made the defense's intent to call Mr. Luis-Castro known on March 2, 2026, the Government coordinated with the Department of Homeland Security and CBP to facilitate his return. By May 20, 2026, CBP had agreed to parole Mr. Luis-Castro into the United States to testify at trial. (*See* Doc. 33 at 2.) On May 22, 2026, I ordered that Mr. Luis-Castro be brought to the United States for testimony at trial on June 10, 2026, and directed the Government to take all reasonable and logical steps to ensure his attendance. (Doc. 51.) By the time of trial, Luis-Azamar had access to Mr. Luis-Castro's testimony through the parole mechanism the Government had arranged. Put simply, the harm the doctrine targets—placing the witness beyond the practical reach of the defense—did not materialize here in a way that deprived Luis-Azamar of access to material testimony.

Second, Mr. Luis-Castro is not, in any practical sense, out of contact with the defense. He is Luis-Azamar's father. Defense counsel identified him as a witness and represented his position to the Court and to the Government from as early as March 2, 2026—including his application for humanitarian parole and the terms on which he was willing to appear for testimony or deposition. When the Government later raised the

concern that Mr. Luis-Castro's testimony might expose him to the risk of self-incrimination, I appointed independent counsel to advise him. That counsel jointly called Mr. Luis-Castro with defense counsel to discuss his testimony. And ultimately, Mr. Luis-Castro has made it clear, through his independent counsel, that he will not testify under any circumstances: as of June 8, 2026, he was not willing to testify in any capacity, including at a deposition in Mexico; and as of June 25, 2026, he was not willing to return to the United States to testify under any circumstances, including even if he were granted full immunity. Mr. Luis-Castro is not a witness whose whereabouts or intentions are unknown to the defense. His absence from trial reflects his own decision—based on his counseled understanding of his constitutional rights—not on any Government-created barrier to defense access.

Taken together, these circumstances distinguish this case from *Valenzuela-Bernal* and *Leal-Del Carmen* in a way that goes to the heart of those doctrines. The Government has not put Mr. Luis-Castro beyond the defense's reach; Mr. Luis-Castro has chosen not to participate. That choice is his to make. Whether the Government's conduct improperly influenced that choice is a separate question, which I take up below in Section III(B). Because the constitutional concern underlying these doctrines is not implicated on this record, Luis-Azamar is not entitled to relief.

### 3.      Adverse Inference Instruction

Luis-Azamar's request for an adverse-inference jury instruction fails for an additional reason. In *United States v. Brutzman*, the defendant sought a missing-witness instruction based on the government's failure to call a witness who had invoked his Fifth Amendment privilege. 731 F.2d 1449, 1453 (9th Cir. 1984), *overruled on other grounds by United States v. Charmley*, 764 F.2d 675, 677 n.1 (9th Cir.1985). The Ninth Circuit held that the witness was not peculiarly within the government's power: he had invoked his privilege against self-incrimination, and "the government chose not to seek use immunity to obtain that testimony." *Id.* at 1453–54. "Where a witness' unavailability results from an invocation of the privilege against self-incrimination, the witness is

unavailable to both parties, and the court's refusal to give an absent witness instruction is proper." *Id.* at 1454; *see also United States v. Lopez-Trujillo*, 630 F. App'x 715, 717 (9th Cir. 2015) (applying *Brutzman* to affirm denial of missing-witness instruction where defense witness invoked Fifth Amendment). The same reasoning applies here. Mr. Luis-Castro's unavailability stems from his own choice not to testify. That choice is not within the Government's power; it is within Mr. Luis-Castro's power alone.

Moreover, because Luis-Azamar is not entitled to the lesser remedy of an adverse-inference instruction, the far greater remedy of dismissal cannot follow. The deportation-of-a-material-witness doctrines guard against a specific harm: the Government using its deportation power to place a witness beyond the practical reach of the defense. Here, the Government coordinated a parole arrangement that restored the defense's access to Mr. Luis-Castro, and Mr. Luis-Castro's absence results from his own decision, communicated through his own counsel, that he will not testify under any circumstances. Nothing in *Valenzuela-Bernal*, *Leal-Del Carmen*, or their progeny supports dismissal of an indictment where the Government has coordinated to make a deported witness available and the witness has independently chosen not to appear.

Luis-Azamar's request for dismissal on this theory and his alternative request for an adverse-inference jury instruction will therefore both be denied.

### B.    Substantial Interference with a Defense Witness

Luis-Azamar's second theory for dismissal is that the Government substantially interfered with Mr. Luis-Castro's decision to testify on his behalf. To prevail on this theory, Luis-Azamar must show (1) substantial government interference with Mr. Luis-Castro; (2) that the Government's conduct caused Mr. Luis-Castro not to testify; and (3) that Mr. Luis-Castro's testimony would have been favorable and material. *See Soo Park*, 851 F.3d at 919. I conclude that Luis-Azamar has met his burden of showing that Mr. Luis-Castro's anticipated testimony would have been material and favorable to the defense, but that Luis-Azamar has not established the substantial-interference or causation elements.

### 1.    Materiality of Anticipated Testimony

Mr. Luis-Castro's anticipated testimony is material and favorable to Luis-Azamar's defense.  The Government raises a number of arguments to the contrary, including that the testimony is cumulative, that his subjective experience could not have informed Luis-Azamar's state of mind, and that his account of the encounter does not fully corroborate Luis-Azamar's.  These arguments are unpersuasive.

Mr. Luis-Castro is the only non-law-enforcement eyewitness to the events giving rise to the charge against Luis-Azamar.  The Government's case will rest on the testimony of ICE officers, all of whom are aligned with the prosecution.  Mr. Luis-Castro's testimony—that he was tackled to the ground and injured his right shoulder—would corroborate the central excessive-force premise of Luis-Azamar's defense-of-others theory.

And the Government's cumulativeness argument overreads the doctrine.  The fact that the apprehending officer acknowledges pushing Mr. Luis-Castro to the ground does not make Mr. Luis-Castro's testimony cumulative.  Mr. Luis-Castro is uniquely positioned to describe the manner, intensity, and effect of the force used against him from the perspective of the person who experienced it.  His account is also relevant to the credibility of the ICE officers whose testimony will form the bulk of the Government's case.

The Government's argument that Mr. Luis-Castro's subjective experience could not have informed Luis-Azamar's state of mind misunderstands the testimony at issue.  The relevant evidence is not what Mr. Luis-Castro felt but what occurred—the push, the force applied to his father—which is the same conduct Luis-Azamar observed.  Mr. Luis-Castro's account of that conduct is direct evidence of what Luis-Azamar saw and responded to.

Finally, the Government's argument that Mr. Luis-Castro's account does not fully corroborate Luis-Azamar's misunderstands the materiality inquiry. Mr. Luis-Castro's testimony need not match Luis-Azamar's in every particular for it to be material.  The core element, that the officers used force in apprehending his father, would be supported.

Differences in detail go to credibility and weight, which are matters for the jury, not for the materiality question I must resolve.

The materiality threshold is not exacting. A "plausible showing" suffices. *Valenzuela-Bernal*, 458 U.S. at 873. Luis-Azamar has cleared that threshold.

### 2.    Substantial-Interference and Causation Inquiries

"The substantial-interference inquiry is extremely fact specific" and turns on the totality of the circumstances. *Juan*, 704 F.3d at 1142 (quotation marks omitted). Considered against that standard, the Government's conduct here does not amount to substantial interference.

Luis-Azamar identifies several pieces of Government conduct that, taken together, he says amount to substantial interference: (1) the exercise of prosecutorial discretion not to charge Mr. Luis-Castro in February 2026; (2) the Government's evolving positions on parole between March and May 2026; (3) the Government's June 2 communications regarding the need for independent counsel; (4) the narrow scope of the non-prosecution representations the Government ultimately made; and (5) the Government's refusal to provide any immunity for testimony. He urges that the totality of these acts, particularly when viewed against the timing—raising the need for independent counsel days before the original trial date—constitutes substantial interference.

The cases on which Luis-Azamar principally relies involve conduct materially different from what occurred here. In *United States v. MacCloskey*, 682 F.2d 468 (4th Cir. 1982), the prosecutor telephoned the defense witness's counsel during trial and indicated that the witness "would be well-advised to remind his client that, if she testified at MacCloskey's trial, she could be reindicted if she incriminated herself during that testimony." *Id.* at 475. The Fourth Circuit characterized the communication as a calculated effort to dissuade the witness. *Id.* at 478–79.[6] *Soo Park* involved a different kind of

---

[6]    The Fourth Circuit itself has questioned *MacCloskey's* continued vitality after *Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988). *See United States v. Alston*, 98 F.3d 1335 (4th Cir. 1996) ("[I]t may be doubted that *MacCloskey* has survived *Bank of Nova*

conduct but was equally aggressive.  There, the Ninth Circuit was reviewing allegations that a detective contacted the defense witness directly, made thinly veiled threats implicating the witness's known domestic abuser, falsely represented the evidence against the defendant, and disparaged the defense team's honesty.  *Soo Park*, 851 F.3d at 920–21. Neither case is close to what the Government did here.  In this case, the Government did not contact Mr. Luis-Castro, did not threaten him or his family, did not misrepresent the evidence, and did not disparage the defense.  Its communications ran through defense counsel and took the form of a *defense motion* to appoint independent counsel for Mr. Luis-Castro—a motion that I granted.

Although Luis-Azamar characterizes the Government's communication as a threat of prosecution, (*see e.g.*, Doc. 78 at 8), the June 2 email did not threaten prosecution; it factually identified potential exposure under 8 U.S.C. § 1326 and recommended appointment of counsel, (*see* Doc. 89-4).  The Fourth Circuit's observation in *United States v. Alston* bears on this analysis.  There, addressing a request for appointment of counsel for a witness facing potential perjury exposure, the court described it as "quite proper to ask for the appointment of an attorney instead of letting the witness unwarily walk into a perjury trap."  *United States v. Alston*, 98 F.3d 1335 (4th Cir. 1996).  The same reasoning applies with equal force here, to a witness facing potential exposure: raising the need for counsel was procedurally proper, not misconduct.

The Government's other conduct during the same period also bears on the totality assessment.  For example, while identifying the need for independent counsel, the Government was concurrently coordinating with the Department of Homeland Security and CBP to arrange Mr. Luis-Castro's return to the United States to testify.  Those affirmative steps to facilitate the witness's appearance are part of the totality of the

*Scotia* . . . in which the Court held that the government had not attempted to manipulate a witness's testimony when the U.S. Attorney had told the witness's attorney that if the witness 'testified for Mr. Kilpatrick all bets were off.'").  I need not address that question. Assuming *MacCloskey* remains good law, its reasoning does not reach the conduct at issue here.

circumstances I must consider.

Likewise, the Government made non-prosecution representations covering violations of 8 U.S.C. §§ 1325 and 1326 for the duration of Mr. Luis-Castro's presence in the United States pursuant to parole. Luis-Azamar emphasizes that these representations were narrow, limited to 8 U.S.C. §§ 1325 and 1326 and to Mr. Luis-Castro's presence pursuant to parole, and that the Government could have offered broader assurances, including a grant of use immunity, and chose not to. But while his observations are correct—the Government could have offered more—the decision whether to immunize a witness is committed to the Executive. *See* 18 U.S.C. § 6003(b). The Ninth Circuit recognizes a narrow exception permitting a defendant to compel immunity, and I have already concluded that Luis-Azamar has not shown either alternative of that exception applies. (*See* Doc. 74 (denying Luis-Azamar's motion to compel immunity).) Thus, the decision to make narrower representations rather than broader ones does not materially change the substantial interference analysis.

Luis-Azamar also raises the timing of the Government's recommendation that counsel be appointed for Mr. Luis-Castro. Earlier identification of the issue might have allowed for a less compressed briefing schedule. But the appointment of independent counsel for Mr. Luis-Castro was appropriate—indeed, *Luis-Azamar* moved for appointment of independent counsel, not the Government. (Doc. 65.) Mr. Luis-Castro's criminal exposure was real and has been present throughout this case, arising from his participation in the events of January 30, 2026. He was entitled to advice from counsel of his own before deciding whether to waive his Fifth Amendment rights and testify. And once advised, Mr. Luis-Castro made his own decision. That a substantively proper recommendation came later in the proceedings than it otherwise could have does not, on this record, reflect substantial interference by the Government.

The record likewise does not establish that Government conduct caused Mr. Luis-Castro's refusal to testify. As set out above, the Government's role was limited to a June 2, 2026 email to defense counsel identifying a potential Fifth Amendment issue and

- 14 -

recommending appointment of counsel.  Luis-Azamar himself moved for that appointment. (Doc. 65.)  Once independent counsel was appointed and Mr. Luis-Castro was advised of his rights, Mr. Luis-Castro made his own decision that he would not testify under any circumstances.  That decision was Mr. Luis-Castro's, not the Government's, and Luis-Azamar has not identified anything in the Government's conduct that caused it.

Considered together, the record does not support Luis-Azamar's substantial-interference claim.  Although Mr. Luis-Castro's anticipated testimony would have been material and favorable to the defense, Luis-Azamar has not carried his burden on either of the remaining elements of the *Soo Park* test.  On interference, the Government's communications proceeded through defense counsel, took the form of a procedurally appropriate recommendation, and were accompanied by concurrent affirmative steps to facilitate Mr. Luis-Castro's return to the United States to testify.  On the totality of the circumstances, this conduct bears no meaningful resemblance to the coercive prosecutorial contact condemned in *MacCloskey* or the direct threats and misrepresentations at issue in *Soo Park*.

On causation, the record shows Mr. Luis-Castro's decision not to testify was his own, not a product of Government conduct.  Mr. Luis-Castro faced criminal exposure arising from his own participation in the events of January 30, 2026—exposure that would have existed regardless of anything the Government did or said in this case.  Once independent counsel was appointed, Mr. Luis-Castro decided, on his own terms, that he would not testify under any circumstances.  That decision has been consistent across multiple hearings and encompasses testimony at trial, testimony at a deposition in the United States, testimony at a deposition in Mexico, and testimony even under a grant of full immunity.  Because Mr. Luis-Castro would not testify even with full immunity, the Government's decision to offer narrower non-prosecution representations, or any other conduct Luis-Azamar identifies, cannot be the cause of his refusal.

Because a claim of substantial interference requires all three elements of the *Soo Park* test, Luis-Azamar's failure to establish the interference and causation elements is

dispositive. *See Soo Park*, 851 F.3d at 919.

IV.   **CONCLUSION**

For the foregoing reasons, the doctrinal framework Luis-Azamar invokes under *Valenzuela-Bernal* and *Leal-Del Carmen* does not apply on this record. He has not shown that Mr. Luis-Castro is peculiarly within the Government's power such that an adverse-inference instruction is warranted, and it follows that dismissal on the deportation-of-a-material-witness theory is likewise unwarranted. Nor has he shown that the Government's conduct amounted to substantial interference with a defense witness under *Soo Park*. The Motion to Dismiss and request for an adverse-inference instruction will therefore be denied.

Accordingly,

**IT IS ORDERED** that Defendant's Motion to Dismiss (Doc. 65) is **DENIED** to the extent it seeks dismissal of the indictment. The remaining requests in Doc. 65 were resolved by prior order.

**IT IS FURTHER ORDERED** that Defendant's Supplemental Motion to Dismiss and Motion for Adverse Jury Instruction (Doc. 78) is **DENIED**.

Dated this 2nd day of July, 2026.

Honorable Sharad H. Desai
United States District Judge

- 16 -